OPINION OF THE COURT
Jasen, J.
In this discovery proceeding brought by the executrix to recover property obtained by appellants from the decedent by means of fraud and undue influence, we are asked to decide whether it was error to admit evidence of two prior judgments decreeing that one of the appellants had engaged in fraud and undue influence in obtaining property from two other elderly individuals.
The record discloses that the decedent, Alice Brandon, was rather frugal by nature. For example, it was said that she used an egg timer while making long distance telephone calls. As a result of her temperate life-style, decedent had managed to amass a tidy sum. Unfortunately, the onset of various ailments, including terminal cancer, made it impossible for the 75-year-old widow to continue to care for herself, and, in December, 1976, she visited the Friendly Acres Home for Adults with the thought of spending her remaining years there. At Friendly Acres, decedent *209 met the owner and operator of the nursing home, appellant Ann Murphy. In conversations with Mrs. Murphy, decedent expressed some concern about her ability to adjust to the institutional life-style at Friendly Acres. Thereupon, Mrs. Murphy offered to take decedent into her private residence, a luxurious home located adjacent to the grounds of a Westchester country club. Decedent quickly accepted this offer and moved into the Murphy home on or about September 1,1977, paying $600 per month for room and board.
In the months that followed, decedent became almost totally dependent on Mrs. Murphy, and the decedent’s family and friends found it increasingly difficult to communicate with her. When they did see her, decedent indicated that she was displeased with her new home. In addition, decedent’s health became progressively worse, and, on September 24, 1977, she apparently suffered a stroke. Yet, perhaps the thing that perplexed her friends and family the most was the drastic change in decedent’s personality immediately after moving into the Murphy home. A person who characteristically did not share her wealth with even those who were closest to her, decedent began showering her new landlord with numerous “gifts”. Most notably, decedent provided Mrs. Murphy with the money to purchase a Mercedes-Benz automobile at a cost of approximately $20,000. In addition, decedent agreed to finance a trip to Florida for herself, Mrs. Murphy and the appellant Mortimer C. O’Brien, Jr.
Alice Brandon died less than one year after moving into the Murphy home. During the last eight months of her life, nearly $130,000 was transferred from the various accounts in her name, usually with some form of “assistance” from Mrs. Murphy. It is undisputed that when decedent entered the Murphy home in September, 1977, she had a net worth in excess of $150,000. Upon her death on May 3,1978, only $35,000 could be located.
The executrix then instituted this proceeding pursuant to SCPA 2103 seeking to recover the assets of the estate of Alice Brandon from the appellants. As a result of a demand made by the executrix (see SCPA 502), the matter was *210 tried before a jury. Over objection, the executrix was permitted to question Mrs. Murphy about two prior judgments that had been entered against her. Specifically, Mrs. Murphy admitted on the stand that one Daniel Sullivan, while a resident in the Murphy home, had set up a trust account for her benefit, but that a judgment had been entered in 1976 ordering the return of the trust corpus to the Sullivan estate on the ground that the trust was the product of undue influence exerted by Mrs. Murphy on the elderly gentleman. Mrs. Murphy also admitted that one Louise Metz, while a resident in the Murphy home, had executed a will that was denied probate in 1978 upon a finding that it was the result of undue influence and fraud engaged in by Mrs. Murphy. By coincidence, Mrs. Murphy happened to be the principal beneficiary under that will.
The Surrogate ruled that the testimony concerning the two prior judgments was admissible as parts of a common scheme or plan by Mrs. Murphy to obtain money from elderly people by means of fraud and undue influence. In charging the jury, however, the Surrogate stated that the testimony concerning the two prior judgments could not be considered as direct evidence on the question whether Mrs. Murphy actually obtained money from the decedent, but could only be used for purposes of determining whether she acted with the intent to obtain the decedent’s property by means of fraud and undue influence. The jury found that the appellants had obtained a considerable portion of Alice Brandon’s estate through the use of fraud and undue influence, and a decree was entered directing appellants to return that which was improperly obtained.
On appeal, a unanimous Appellate Division affirmed, stating that “the Sullivan-Metz matters were properly admitted as tending to establish a common scheme or plan under which appellants inveigle into Murphy’s place of residence aged and ailing residents of her nursing home for the purpose of stripping them of their life savings.” (79 AD2d, at p 248.) We affirm, but on a somewhat different rationale than that relied upon by the court below.
A general rule of evidence, applicable in both civil and criminal cases, is that it is improper to prove that a person *211 did an act on a particular occasion by showing that he did a similar act on a different, unrelated occasion. (See Richardson, Evidence [10th ed], §§ 170, 184.) Certain exceptions to this rule have been recognized where the evidence offered has some relevancy to the issues presented other than mere similarity. Although not subject to precise categorization, evidence of other similar acts will be admitted if it tends to establish: (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan; or (5) identity. (People v Molineux, 168 NY 264, 293; accord Nev York Proposed Code of Evidence, § 404, subd [b].) This appeal involves the second and fourth categories of the celebrated Molineux exceptions.
Where guilty knowledge or an unlawful intent is in issue, evidence of other similar acts is admissible to negate the existence of an innocent state of mind. (People v Molineux, supra, at pp 297-298; see People v Schwartzman, 24 NY2d 241, 247-249; Richardson, Evidence [10th ed], §§ 172-176.) The focus here is not on the actual doing of the act, for the act is either conceded or established by other evidence. Rather, the element in issue is the actor’s state of mind, and evidence of other similar acts is admitted under this exception because no particular intent can be inferred from the nature of the act committed. (People v Molineux, supra; People v Katz, 209 NY 311, 327-328; Richardson, Evidence [10th ed], § 172.) Indeed, the intent exception has often been applied in cases where fraud is alleged because a fraudulent intent rarely can be established by direct evidence. (People v Schwartzman, 24 NY2d 241, 248, supra; Beuerlien v O’Leary, 149 NY 33, 38-39; Richardson, Evidence [10th ed], § 184.) Similar considerations come into play when it is claimed that a person has exerted undue influence.
The intent exception is predicated primarily on a theory of increased probability arising from repetitive actions. According to Professor Wigmore: “The argument here is purely from the point of view of the doctrine of chances — the instinctive recognition of that logical process which eliminates the element of innocent intent by multiplying instances of the same result until it is perceived that this element cannot explain them all.” (2 Wigmore, Evidence *212 [Chadbourn rev ed], § 302, p 241.) Stated somewhat differently, the successive repetition of similar unlawful acts tends to reduce the likelihood of the actor’s innocent intent on the particular occasion in question. (See, e.g., People v Marrin, 205 NY 275, 282.) The crucial consideration under the intent exception is, therefore, the degree of similarity between the various acts and not their connection with one another. (People v Schwartzman, 24 NY2d 241, 248, supra; 2 Wigmore, at p 245; see, also, McCormick, Evidence [2d ed], § 197, p 468.)
In contrast, somewhat different principles apply where evidence of similar acts is admitted pursuant to the “common scheme or plan” exception. Here, proof of similar acts is offered not to establish a particular intent, but to prove that the person did the act in issue. (2 Wigmore, § 304, at p 249.) Under this exception, evidence of collateral acts is admitted provided it is shown that the collateral acts are sufficiently connected with the act in issue such that each forms a part of a common plan on the part of the actor to achieve some ultimate result. (People v Molineux, supra, at pp 305-310; see, also, Altman v Ozdoba, 237 NY 218; see, generally, Richardson, Evidence [10th ed], §§ 179, 184.) Unlike the intent exception, mere similarity between the acts is an insufficient predicate for admissibility under the common scheme or plan exception. Rather, “[s]ome connection between the [acts] must be shown to have existed in fact and in the mind of the actor, uniting them for the accomplishment of a common purpose, before such evidence can be received.” (People v Molineux, supra, at p 306.) Indeed, there must be such a clear concurrence of common features — i.e., time, place and character — that “the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.” (2 Wigmore, Evidence [Chadbourn rev ed], § 304, p 249; compare, e.g., People v Grutz, 212 NY 72, with People v Duffy, 212 NY 57.) In the absence of such a clear connection between the collateral acts and the act in issue, the evidence should be excluded. (People v Molineux, supra; see People v Fiore, 34 NY2d 81, 84-87.)
Thus, the intent exception and the “common scheme or plan” exception constitute two discrete theories under *213 which evidence of collateral acts may be admitted. Unfortunately, the distinction between the two exceptions has sometimes been overlooked and, as a result, the more stringent requirements of the common scheme or plan exception (i.e., direct connection in time, place and character) have been applied in cases in which only the intent theory was involved. (E.g., Boyd v Boyd, 164 NY 234, 241-242; Hall v Naylor, 18 NY 588, 589; see Richardson, Evidence [10th ed], §§ 175,177; Fisch, New York Evidence [2d ed], § 216, p 128.) In fact, a failure to distinguish between these two exceptions was the cause of the problem in this case.
In the end, the main distinction between the two exceptions is found in the purpose for which evidence of collateral acts is admitted under each. As Professor Wigmore explains: “The clue to the difference is best gained by remembering that in the one class of cases the act charged is assumed as done, and the mind asks only for something that will negative innocent intent; and the mere prior occurrence of an act similar in its gross features — i.e., the same doer, and the same sort of act, but not necessarily the same mode of acting nor the same sufferer, may suffice for that purpose. But where the very act is the object of proof, and is desired to be inferred from a plan or system, the combination of common features that will suggest a common plan as their explanation involves so much higher a grade of similarity as to constitute a substantially new and distinct test.” (2 Wigmore, Evidence [Chadbourn rev ed], § 304, p 251.)
Applying these principles to the facts of this case, the prior judgments against Mrs. Murphy should not have been admitted as evidence of a common scheme or plan. The executrix made no showing that the Sullivan-Metz incidents had any direct connection, either in fact or in Mrs. Murphy’s mind, with the fraud and undue influence visited upon Alice Brandon. Indeed, the record indicates that the Sullivan-Metz matters were no more than “separate and independent transaction^] entered into as the occasion arose and not in pursuance of any preconcerted general plan or design.” (People v Grutz, 212 NY 72, 79, supra.)
*214 Nevertheless, we conclude that there should be an affirmance. As noted earlier, although the evidence of the two prior judgments initially was admitted under the common scheme or plan exception and that exception was referred to in the charge, the Surrogate ultimately instructed the jury that testimony concerning the SullivanMetz matters could only be used “upon the question of the intent of Ann Murphy to obtain monies from Alice Brandon by fraud or undue influence.” The jury was specifically told that they could not use this testimony as evidence that appellant Murphy in fact obtained the decedent’s property. True, this charge resulted in a shift in the theory under which this evidence initially was admitted. However, inasmuch as both appellants failed to object to the charge as given, they cannot raise that claim for the first time in this court.
For purposes of the intent exception, there was a sufficient degree of similarity between the Sullivan-Metz mátters — as to each of which Mrs. Murphy is bound by the conclusion that she intended to defraud these individuals — and the activities of Mrs. Murphy in this case to permit the introduction of evidence of the two prior judgments in order to negate her innocent state of mind. In all three situations, appellant Murphy brought elderly and infirm individuals into her home, lulled them into a false sense of security and dependence, and then proceeded to strip them of their life savings. Admittedly, these misdeeds occurred over a period of a few years. There is, however, no strict time limitation that governs the admissibility of such proof for the purpose of establishing intent. (See Richardson, Evidence [10th ed], § 177.) Under the particular circumstances of this case, we cannot say, as a matter of law, that these prior acts were so remote in time that the potential for prejudice outweighed the probative value of this evidence on the issue of Mrs. Murphy’s intent to engage in fraud and undue influence.
Finally, contrary to Mrs. Murphy’s contention, there is sufficient circumstantial proof to sustain the jury’s findings that she obtained certain assets from the decedent. Those findings, having been affirmed by the Appellate Division, are now beyond this court’s power of review. (NY Const, art VI, § 3, subd a; CPLR 5501, subd [b].)
*215 For the reasons stated, the order of the Appellate Division should be affirmed, with costs.
Chief Judge Cooke and Judges Gabrielli, Jones, Wachtler, Fuchsberg and Meyer concur.
Order affirmed.